UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ASCEND ROBOTICS LLC, | * * * | |
| Plaintiff, | * | |
| v. | * * | No. 1:20-cv-10934-ADB |
| CARCHARADON, LLC and DAVID SWEIG, | * * | |
| Defendants. | * * | |

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO COMPEL ARBITRATION

BURROUGHS, D.J.

Plaintiff Ascend Robotics LLC ("Ascend") brings this action against Defendants David Sweig and Carcharadon, LLC ("Carcharadon," and, with Sweig, "Defendants"), seeking a declaratory judgment that it need not participate in a JAMS arbitration (the "Arbitration") that Defendants have commenced against Ascend and non-parties Aryze LLC ("Aryze") and David Askey.[1]  [ECF No. 1-1 at 1–9].  Currently before the Court is Defendants' motion to compel arbitration.  [ECF No. 7].  For the reasons set forth below, Defendants' motion is DENIED.

## I.    BACKGROUND

The Court draws the following facts from the complaint and from the documents submitted in support of the motion to compel arbitration.  Cullinane v. Uber Techs., Inc., 893 F.3d 53, 55 (1st Cir. 2018) (citing Gove v. Career Sys. Dev. Corp., 689 F.3d 1, 2 (1st Cir. 2012)).

---

[1] Ascend also sought a stay of the Arbitration pending resolution of this matter.  [ECF No. 1-1 at 8].  Because Defendants have voluntarily stayed the Arbitration, [ECF No. 6 at 3], the Court will not evaluate Ascend's request for a stay.

## A.     The Parties

Ascend is a Delaware limited liability company with its principal place of business in Massachusetts.  [ECF No. 1-1 at 2].  It owns the right to and has developed intellectual property ("IP") for other businesses; its model is to own and develop technology and then license it to affiliated companies to utilize commercially in various industries.  [Id. at 3].  Askey is a Massachusetts resident who substantially owns and controls Ascend.  [ECF No. 8-6 ¶¶ 3–4].  Aryze is a Delaware limited liability company formed by Askey.  [Id. ¶ 5].  Aryze was formed to license technology from Ascend for use in the commercial painting industry.  [ECF No. 1-1 at 3].

Carcharadon is an Illinois limited liability company, whose sole member is Sweig, an Illinois resident.  [ECF No. 8-6 ¶¶ 1–2].  Sweig works through Carcharadon to provide consulting services to businesses and investors.  [Id. ¶ 2].

## B.     The Arbitration

On March 11, 2020, Defendants initiated a JAMS arbitration proceeding against Askey, Aryze, and Ascend by filing a demand for arbitration and statement of claims.  [ECF No. 8-6]. As relevant for present purposes, Defendants brought claims against Ascend for fraud, [id. ¶¶ 310–18], promissory fraud, [id. ¶¶ 319–25], negligent misrepresentation, [id. ¶¶ 326–33], tortious interference with contracts, [id. ¶¶ 334–40], tortious interference with business expectancy, [id. ¶¶ 341–47], equitable estoppel, [id. ¶¶ 348–54], breach of fiduciary duty, [id. ¶¶ 355–60], quantum meruit, [id. ¶¶ 361–67], and constructive trust, [id. ¶¶ 368–72].  Defendants assert that their claims against Ascend are subject to arbitration "in accordance with the arbitration provisions of the pertinent agreements between the parties."  [Id. at 3].  Because Defendants' factual allegations in the arbitration demand are germane to whether their claims against Ascend are arbitrable, the Court summarizes them in pertinent part.

Sweig has nearly three decades of experience as a management consultant, investment banker, and entrepreneur.  [ECF No. 8-6 ¶ 1].  He has advised companies of various sizes and stages of development regarding mergers and acquisitions, restructuring, and capital management.  [Id.].  In August 2017, Sweig was introduced to Askey and Robert Cohanim.[2]  [Id. ¶ 6].  Askey and Cohanim told Sweig that they were working on a "major global business opportunity" involving the use of robots as substitutes for human laborers in the commercial painting industry, but needed assistance in "defining, organizing, and pursuing" the business opportunity.  [Id. ¶ 7].  Ascend, a company owned by Askey, would supply the underlying robot technology.  [Id. ¶¶ 8–11].  Askey and Cohanim, who noted their experience with and knowledge of technology start-ups and the construction industry, invited Sweig to join their business venture, emphasizing that Sweig's skillset was integral to the venture's success.  [Id. ¶¶ 12–19].  They also told him that they had promising leads in the search for potential investors and that the painting robot prototype would be ready for testing by August 2018.  [Id. ¶¶ 20–22].

Sweig was interested in joining the business venture and sent Askey and Cohanim a draft contractor and consulting agreement for their review.  [ECF No. 8-6 ¶ 27].  Sweig, Askey, and Cohanim, each represented by counsel, negotiated the terms and, in December 2017, executed an agreement (the "December 2017 Agreement").  [Id. ¶ 33].  Pursuant to the December 2017 Agreement, Askey, Cohanim, and Aryze's predecessor, Phoenix Construction ("Phoenix"), retained Carcharadon to provide Phoenix with "analysis, advice and assistance with respect to a wide variety of strategic, financial and operational issues related to the commercialization of various robotics applications for the global construction and/or adjacent marketplaces."  [ECF No. 8-2 at 2].  Carcharadon, among other things, was to consult on "[s]trategic issues including

[2] Robert Cohanim is not a party to either this litigation or the Arbitration.

business definition, route to market, pricing, strategic partnerships"; "[o]perational issues including defining capability and competency requirements, hiring/resourcing, contract manufacturing and supply chain"; "[f]inancial issues including development of an operating budget, financing plan and capital structure as well as pricing structure"; and "[a]dministrative issues including working on the LLC agreement, branding, policies/procedures and business processes as well as various legal matters."  [Id. at 2].  As compensation, Carcharadon would receive $55,000 in installments, a 5% ownership interest in Phoenix, which would incrementally vest at periodic intervals, and a board seat.  [Id. at 3–4].  The December 2017 Agreement's integration clause provides that the agreement "contains the entire agreement of the parties and supersedes all prior agreements and understandings between the parties regarding Carcharadon's engagement," and its arbitration clause states that "[a]ny disputes between the parties arising from this Agreement will be settled through binding arbitration through JAMS in Chicago, Illinois or similar body."[3]  [Id. at 4–5].  Ascend is not a party to the December 2017 Agreement.[4] [Id. at 2].

    In January 2018, Aryze was formed, and the parties agreed that it would step into Phoenix's shoes with respect to the December 2017 Agreement.  [ECF No. 8-6 ¶ 45].  Sweig and Askey discussed how best to grow Aryze, agreeing that Aryze should be a distinct corporate entity and that Ascend should provide its existing IP and technology to be utilized freely by Aryze.  [Id. ¶ 47].  More specifically, the parties contemplated an arrangement whereby, in

---

[3] The December 2017 Agreement was subsequently amended in December 2018 to reflect the fact that Carcharadon's ownership interest had vested.  [ECF No. 1-1 at 20–21].

[4] Apart from the fact that the December 2017 Agreement is addressed to "Mr. David Askey[,] Chief Executive Officer[,] Ascend Robotics LLC," [ECF No. 8-2 at 2], the December 2017 Agreement does not reference Ascend, see [id. at 2–6].

exchange for equity in Aryze, Ascend would grant Aryze an exclusive, perpetual, royalty-free license to use all current and future Ascend IP in the commercial painting industry and related markets. [Id. ¶ 48].

In early 2018, Sweig, through Carcharadon, began assembling a team of construction experts and other advisors for Aryze. [ECF No. 8-6 ¶¶ 49–51]. By May 2018, Sweig had nearly completed a confidential investor memorandum ("CIM"), a teaser,[5] and a detailed five-year financial forecasting and economic return model. [Id. ¶ 53]. Askey and Cohanim reviewed and approved the materials that Sweig had prepared, which, among other things, outlined the IP licensing plan. [Id. ¶¶ 55–56]. Sweig told Askey and Cohanim that Aryze needed capital to support its operations and highlighted the importance of developing a working robotic prototype and partnering with construction companies. [Id. ¶ 64]. To allow him to focus on Aryze and help it raise the necessary capital by October 2018, Sweig terminated two lucrative Carcharadon consulting agreements, which, in combination, were generating monthly revenue between $65,000 and $75,000. [Id. ¶¶ 65–66]. He also forwent additional, potentially profitable business opportunities to focus his energies exclusively on Aryze. [Id. ¶¶ 70–71].

In June 2018, Carcharadon entered into another agreement with Aryze, Askey, and Cohanim (the "June 2018 Agreement," and, together with the December 2017 Agreement, the "Agreements"). [ECF No. 8-6 ¶ 72]. Under the June 2018 Agreement—to which Ascend is again not a party[6]—Carcharadon was engaged to provide Aryze with "consulting services, analysis, advice, and assistance with respect to ARZYE's [sic] efforts to raise up to $50 million

---

[5] A teaser is a one-page summary of the CIM. [ECF No. 8-6 ¶ 53].

[6] Apart from the fact that the June 2018 Agreement is addressed to "Mr. David Askey[,] Chief Executive Officer[,] Ascend Robotics LLC," [ECF No. 8-2 at 14], the June 2018 Agreement does not reference Ascend, [id. at 14–19].

capital, in one or more Series ('Committed Capital') in support of Aryze's commercialization."
[ECF No. 8-2 at 14].  The June 2018 Agreement would last until (1) Aryze raised $50 million in
Committed Capital, (2) Sweig joined Aryze as CEO or CFO, or (3) June 2019, whichever
occurred earliest.  [Id. at 15].  As compensation, Carcharadon would receive a monthly $10,000
retainer, a cash bonus of $375,000 once Aryze obtained in $7.5 million in Committed Capital,
and additional cash bonuses contingent on how much Committed Capital Aryze ultimately
obtained.  [Id. at 15–16].  The June 2018 Agreement contains integration and arbitration
provisions identical to those in the December 2017 Agreement.  [Id. at 16–17].[7]

After the June 2018 Agreement was executed, Sweig continued to emphasize to Askey
the importance of the IP licensing agreement between Ascend and Aryze.  [ECF No. 8-6
¶¶ 90–93].  In July 2018, Askey or his attorneys sent Sweig a draft IP licensing agreement that
was consistent with Sweig's understanding of the plan.  [Id. ¶¶ 93–94].  At the same time, Sweig
continued to work on the CIM, teaser, financial forecasts, and other business-related documents.
[Id. ¶¶ 95–96].  Askey consistently provided positive feedback about Sweig's work and never
commented on or contradicted statements about the IP licensing agreement included in those
documents.  [Id. ¶¶ 95–97].  By August 2018, Sweig had completed a seventy-four page CIM for
Aryze, but neither Askey nor Cohanim had brought in any potential investors and they were
behind schedule on producing the robotic prototype.  [Id. ¶¶ 85, 87–88, 98].  Nonetheless,
potential investors were intrigued by the materials that Sweig had prepared and continued to

---

[7] The June 2018 Agreement was subsequently amended in December 2018 to extend the term
and alter the compensation structure, [ECF No. 1-1 at 29–31], and again in March 2019 to
further adjust the compensation structure by providing for immediate cash payments, [id. at
32–34].

express interest in investing in Aryze, focusing, in particular, on the relationship between Ascend and Aryze.  [Id. ¶¶ 105–06].

By February 2019, Sweig's frustration with Askey was mounting, given Askey's consistent delays and failure to provide Sweig with necessary information.  [ECF No. 8-6 ¶¶ 119–20].  For instance, although Aryze was formed in early 2018, there still was no finalized operating agreement ("OA").[8]  [Id. ¶ 122]; see also [id. ¶¶ 61, 109 (demonstrating drafts had been circulated previously)].  Sweig outlined his frustrations in an email to Askey, noting that if various open items, such as the lack of a finalized OA and IP licensing agreement, remained unresolved by March 2019, he would sever ties with Aryze.  [Id. ¶¶ 120, 123–27].  Askey acknowledged Sweig's concerns but did not finalize the documents.[9]  [Id. ¶¶ 130–32].  Sweig threatened to quit, but ultimately agreed to remain with Aryze only after the June 2018 Agreement was amended to provide for additional cash payments to Carcharadon.  [Id. ¶¶ 133–37].  Shortly after the amendment, Ascend paid Carcharadon $85,000 on behalf of Aryze.  [Id. ¶ 139].[10]

In April 2019, Sweig initiated serious discussions with Saint-Gobain, a world-renowned building products and materials company, regarding an investment in Aryze.  [ECF No. 8-6

---

[8] An OA is "a key document used by LLCs because it outlines the business'[s] financial and functional decisions including rules, regulations and provisions.  The purpose of the document is to govern the internal operations of the business in a way that suits the specific needs of the business owners.  Once the document is signed by the members of the limited liability company, it acts as an official contract binding them to its terms."  Ijeoma S. Nwatu, Basic Information About Operating Agreements, U.S. Small Business Administration, (May 18, 2016), https://www.sba.gov/blog/basic-information-about-operating-agreements (May 18, 2016)..

[9] Around this time, Askey informed Sweig that Cohanim would no longer be involved with Aryze in any meaningful way.  [ECF No. 8-6 ¶ 121].

[10] Ascend subsequently paid Carcharadon an additional $125,000 on Aryze's behalf, pursuant to the June 2018 Agreement as amended.  [ECF No. 8-6 ¶ 140].

¶¶ 147–48].  Sweig met with Saint-Gobain representatives on April 25, 2019, and by May 2019, Saint-Gobain expressed interest in investing in Aryze.  [Id. ¶¶ 149–50, 156].  Given Saint-Gobain's reputation in the construction industry, its investment in Aryze would have signaled to other investors that Aryze was a promising company.  [Id. ¶¶ 157–58].  During the same period, Sweig was also in contact with WeWork Companies, Inc. ("WeWork"), one of the world's largest landlords, regarding WeWork possibly becoming an Aryze customer.  [Id. ¶¶ 151–52].  Sweig reported the positive results of a field test completed by the Aryze robot, and WeWork indicated interest in collaborating with Aryze.  [Id. ¶¶ 153–55].

The developments with Saint-Gobain and WeWork intensified the need for Aryze to finalize its OA and IP licensing agreement with Ascend.  [ECF No. 8-6 ¶ 159].  In late May and again in June 2019, Askey sent Sweig a draft IP licensing agreement that was consistent with Sweig's expectations.  [Id. ¶¶ 165–67, 178–79].  By that time, Askey and Ascend had produced a working robotic prototype, and Sweig had updated Aryze's CIM and teaser accordingly.  [Id. ¶¶ 168–71].  The updated materials stated that Aryze had a perpetual, royalty-free IP license from Ascend.  [Id. ¶¶ 170–71].  Askey and Sweig met with Saint-Gobain representatives in June 2019 and, at the meeting, told them that Aryze had negotiated a perpetual, royalty-free license agreement with Ascend.  [Id. ¶¶ 174–75].  Around the same time, Askey sent Sweig another draft Aryze OA, which reflected an increased ownership interest for Sweig as well as his capital contribution.  [Id. ¶¶ 180–83].  Still, Askey did not finalize the OA, blaming lawyers and other time commitments.  [Id. ¶¶ 185–86].  Sweig offered to assume responsibility for finalizing the OA, but Askey refused to cede control of the drafting process.  [Id. ¶ 186].

In July 2019, Sweig continued to have productive discussions with Saint-Gobain, who remained interested in investing.  [ECF No. 8-6 ¶¶ 193–94].  In light of Saint-Gobain's interest,

Sweig began vetting law firms to represent Aryze in a potential investment transaction, including, at Askey's suggestion, Holland & Knight, LLP ("H&K"), which represented Askey and Ascend.  [Id. ¶ 195].  During his search, Sweig emphasized to Askey that Aryze and potential investors needed independent counsel to ensure that all of Aryze's foundational documents, including the OA and the IP license agreement, were suitable, financeable, and market-based.  [Id. ¶ 196].  When Sweig told Saint-Gobain that Aryze was considering retaining H&K, Saint-Gobain told Sweig that H&K was Saint-Gobain's counsel, expressed concerns about potential conflicts of interest, and told Sweig that its strong preference would be for Aryze to retain another law firm.  [Id. ¶¶ 197–200].  Sweig relayed Saint-Gobain's message to Askey, and continued his law firm search.  [Id. ¶¶ 202–04].  During the search, Sweig learned that Askey and H&K had been discussing revisions to the IP licensing agreement and the OA.  [Id. ¶ 204].

In August 2019, Sweig and Askey exchanged emails and phone calls regarding Sweig's ownership interest in Aryze.  [ECF No. 8-6 ¶¶ 209–26].  After some back and forth, Sweig and Askey seemed to agree that Askey would own 22.8% of Aryze, Ascend would own 21.2%, and Sweig would own 17.5%, and that Askey, Ascend, and Sweig would be the only three voting members.  [Id. ¶¶ 219–20].  Later that month, Askey sent Sweig the latest draft of the IP licensing agreement.  [Id. ¶ 227].  Unlike the previous versions, which had all outlined the same basic arrangement, this draft was materially different in that it did not grant Aryze a perpetual, royalty-free license for Ascend's IP.  [Id. ¶¶ 228–30].  Sweig consulted counsel at DLA Piper who informed him that Saint-Gobain would be unlikely to invest if Aryze were to execute that version of the IP licensing agreement, and he communicated this concern to Askey.  [Id. ¶¶ 231–33].  Over the next few weeks, Sweig sent messages and emails to Askey and H&K attorneys, expressing his surprise and disappointment in what he perceived to be a "bait and

switch" regarding the structure of the IP licensing agreement.  [Id. ¶¶ 248–49].  Askey told Sweig that H&K was revising the agreement to address Sweig's concerns, and, during a conference call with Aryze's advisory board, blamed the issues on H&K.  [Id. ¶¶ 251–52].  H&K circulated a new draft of the IP licensing agreement on September 15, 2019 but it did not address any of Sweig's concerns and, in fact, was even more problematic than the prior draft.  [Id. ¶¶ 256–61].  Sweig texted Askey noting his frustration and disappointment and suggested that they discuss the situation over the phone.  [Id. ¶ 264].

On September 17, 2019, Sweig, Askey, and lawyers from H&K and DLA Piper had a conference call.  [ECF No. 8-6 ¶ 265].  During the call Askey held firm on the new licensing language and said that he was going to present the draft IP licensing agreement to Saint-Gobain notwithstanding Sweig's concerns.  [Id. ¶¶ 266–67].  During another conference call the same day, Askey stated Ascend's desire to leverage Aryze's operating platform to support other Ascend businesses.  [Id. ¶ 269].  The same day, Askey fired Sweig during yet another conference call.  [ECF No. 8-6 ¶ 274].  Two days later, he sent an email to Sweig confirming that he had terminated the Agreements.  [Id. ¶ 276].  Askey stated two reasons for the termination: (1) Sweig's indication that if asked by Saint-Gobain, he would communicate his disapproval of the draft IP licensing agreement; and (2) the fact that Sweig's temperament made him ill-suited to serve as an Aryze executive.  [Id. ¶ 280].  About five months later, in February 2020, Askey told Sweig that Aryze ceased operations shortly after Sweig was let go.  [Id. ¶ 282].

In sum, Sweig alleges that he, through Carcharadon, provided services to Aryze for nearly two years based on his understanding that he would end up with equity in a valuable company.  Then, after he had done a great deal of legwork—including, but not limited to, preparing financial forecasts and documents, engaging advisors, and lining up potential investors

and customers—Askey, Aryze, and Ascend abruptly changed course and decided that Aryze would not be fully independent from Ascend even though, in Sweig's view and the views of others knowledgeable in the field, such independence was integral to Aryze's value.  In Sweig's words, Askey, Aryze, and Ascend "deceitfully induce[d] [] Sweig, whose expertise, network of stellar relationships, and energy they needed, to build a major business—and then at the 11th hour, after [] Sweig's efforts had substantially assured success, [they] turn[ed] a blind eye to their inducements—and seize[d] the immense opportunity for [] Askey and his company, Ascend Robotics, LLC."  [ECF No. 8-6 at 1–2].

C.    **Procedural Background**

On May 1, 2020, Ascend sued Defendants in Suffolk County Superior Court, seeking a declaratory judgment that it did not have to participate in the Arbitration.  [ECF No. 1-1 at 1–9]. Defendants removed the action to this Court on May 15, 2020, [ECF No. 1], and answered on May 22, 2020, [ECF No. 6].  On June 12, 2020, Defendants filed the instant motion to compel arbitration.  [ECF No. 7].  Ascend opposed on July 10, 2020, [ECF No. 12], Defendants replied on August 19, 2020, [ECF No. 17], and Ascend filed a sur-reply on September 2, 2020, [ECF No. 20].  On September 21, 2020, Defendants sought leave to file a declaration, [ECF No. 21], which Ascend opposed, [ECF No. 22].  The Court granted leave to file the declaration, noting that it would consider the declaration only to the extent it merited consideration.  [ECF No. 23]. After the declaration was filed, [ECF No. 24], Ascend filed a short response, [ECF No. 27].[11]

---

[11] Having reviewed the Houghton declaration, [ECF No. 24-1], the Court concludes that it is irrelevant to the issue at hand and will not consider it further.

## II.    LEGAL STANDARD

The Federal Arbitration Act ("FAA") was enacted primarily to "overcome judicial hostility to arbitration agreements," Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S. 265, 272 (1995), and it "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts."  Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino, 640 F.3d 471, 474 (1st Cir. 2011) (quoting Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443 (2006).  Under the FAA, "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The party seeking to compel arbitration bears the burden of proving "that a valid agreement to arbitrate exists, the movant has a right to enforce it, the other party is bound by it, and that the claim asserted falls within the scope of the arbitration agreement."  Oyola v. Midland Funding, LLC, 295 F. Supp. 3d 14, 16–17 (D. Mass. 2018) (citing Bekele v. Lyft, Inc., 199 F. Supp. 3d 284, 293 (D. Mass. 2016), aff'd, 918 F.3d 181 (1st Cir. 2019)).

"[A] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*."  Granite Rock Co. v. Int'l Brotherhood of Teamsters, 561 U.S. 287, 297 (2010).  The First Circuit has stated that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  InterGen N.V. v. Grina, 344 F.3d 134, 142 (1st Cir. 2003) (quoting AT&T Techs., Inc. v. Commc'ns. Workers of Am., 475 U.S. 643, 648 (1986)).  Although there are some exceptions, "courts should be extremely cautious about forcing arbitration in 'situations in which the identity of the parties who have agreed to arbitrate is unclear.'"  Id. (quoting McCarthy v.

12

Azure, 22 F.3d 351, 355 (1st Cir. 1994)).  "[A] 'basic precept' underlying the FAA is that

'arbitration is a matter of consent, not coercion.'"  Ouadani v. TF Final Mile LLC, 876 F.3d 31,

36 (1st Cir. 2017) (quoting Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 681

(2010)).

## III.  DISCUSSION

"The question of arbitrability—that is, whether or not the parties have agreed to submit a

dispute to arbitration—is 'an issue for judicial determination [u]nless the parties clearly and

unmistakably provide otherwise.'"  Álvarez-Maurás v. Banco Popular of P.R., 919 F.3d 617, 623

(1st Cir. 2019) (alteration in original) (quoting Howsam v. Dean Witter Reynolds, Inc., 537 U.S.

79, 83 (2002)).  Here, neither party has suggested that the question of arbitrability has been

delegated to an arbitrator.  Accordingly, the issue is left to the Court.[12]

It is undisputed that Ascend was not a party to the Agreements.  See [ECF No. 8 at 2

(acknowledging Ascend's status as a non-party); ECF No. 12 at 1 (same)].  Nevertheless,

Defendants maintain that Ascend is required to arbitrate their claims against it under three

theories: (1) equitable estoppel, (2) third-party beneficiary, and (3) agency.  [ECF No. 8 at

15–20].  Additionally, Defendants assert that the interests of judicial economy cut in favor of

requiring Ascend to arbitrate.  [ECF No. 17 at 10–11].

---

[12] The parties seem to agree that federal common law governs whether Defendants' claims
against nonsignatory Ascend are subject to the Agreements' arbitration provisions, see [ECF No.
8 at 15–20 (citing federal law throughout); ECF No. 12 at 13–19 (same)], notwithstanding the
fact that the Agreements contain Illinois choice-of-law provisions, [ECF No. 8-2 at 5 (December
2017 Agreement); id. at 17 (June 2018 Agreement)].  Although the First Circuit has noted that
the Supreme Court has called into question whether courts should use federal common law, as
opposed to specific state law, to determine whether nonsignatories are bound by arbitration
clauses, see Grand Wireless, Inc. v. Verizon Wireless, Inc., 748 F.3d 1, 11–12 (1st Cir. 2014),
the First Circuit has also applied federal common law since then, see Ouadani, 876 F.3d at 37.
Given that the issue is uncontested here, the Court will apply federal common law.

### A.      Defendants' Claims Against Ascend Do Not Arise from the Agreements

The Agreements contain identical arbitration clauses, which provide that "[a]ny disputes between the parties arising from the Agreement will be settled through binding arbitration through JAMS in Chicago, Illinois or similar body."  [ECF No. 8-2 at 5 (December 2017 Agreement); id. at 17 (June 2018 Agreement)].  Additionally, the Agreements contain identical integration clauses, which state that "[t]his Agreement contains the entire agreement of the parties and supersedes all prior agreements and understandings between the parties regarding Carcharadon's engagement."  [Id. at 4 (December 2017 Agreement); id. at 16 (June 2018 Agreement)].  After considering these contractual provisions, the Court concludes that Ascend is not required to arbitrate Defendants' claims.

Defendants' claims against Ascend do not "aris[e] from" the Agreements.  The Agreements are limited in scope and concern only what services Carcharadon would provide to Aryze.  Thus, a dispute involving Ascend's IP plainly does not "arise from" the Agreements.  Despite the narrow scope of the Agreements, the thrust of Defendants' arbitration complaint is that Ascend strung Sweig along for two years only to abruptly change course regarding how Aryze would acquire Ascend's IP, leaving Sweig with equity in a worthless entity.[13]  The Agreements, however, do not mention Ascend's IP at all, much less govern how Aryze would

---

[13] In the Arbitration, Defendants maintain that Ascend: fraudulently and/or negligently induced them into entering the Agreements by making representations regarding, among other things, how Aryze would be structured, [ECF No. 8-6 ¶¶ 310–33 (Counts III, IV, and V)], tortiously interfered with the Agreements and Defendants' business expectations by, among other things, seizing the fruits of Sweig's labor for itself and sabotaging Aryze, [id. ¶¶ 334–47 (Counts VI and VII)], misrepresented how much equity Sweig would receive and how the IP license agreement between Aryze and Ascend would be structured, [id. ¶¶ 348–54 (Count VIII)], breached its fiduciary duties, [id. ¶¶ 355–60 (Count IX)], inequitably benefitted from services that Sweig rendered directly to Ascend, not covered by the Agreements, without compensating him, [id. ¶¶ 361–67 (Count X)], and inequitably usurped Aryze's business opportunity, which Sweig had contributed to, [id. ¶¶ 368–72 (Count XI)].

acquire the use of it.  Again, the Agreements governed only the provision of specific services by Carcharadon to Aryze.  [ECF No. 8-2 at 2 (noting that pursuant to the December 2017 Agreement, Carcharadon would provide "analysis, advice and assistance with respect to a wide variety of strategic, financial and operational issues related to the commercialization of various robotics applications for the global construction and/or adjacent marketplaces"); id. at 14 (noting that pursuant to the June 2018 Agreement, Carcharadon would provide "consulting services, analysis, advice, and assistance with respect to ARZYE's [sic] efforts to raise up to $50 million capital, in one or more Series ('Committed Capital') in support of Aryze's commercialization")].

The fact that the Agreements contain an arbitration provision does not mean that any claim brought by Defendants against Askey, Aryze, and/or Ascend related to their business relationship must be arbitrated.  The scope of the arbitration provision simply does not cover disputes involving Ascend even if such disputes touch on other aspects of the business relationship.  See Hogan v. SPAR Grp., Inc., 914 F.3d 34, 41 (1st Cir. 2019) (noting that the scope of the contractual language is crucial to determining whether claims are covered).  As drafted, the Agreements cover only claims "arising from" the Agreements, and Defendants' claims against Ascend in the Arbitration do not arise from the Agreements.  Where Sweig was a sophisticated commercial operator and the parties were represented by counsel when negotiating the Agreements, see [ECF No. 8-6 ¶¶ 1, 33, 72], the decision not to include disputes with Ascend within the arbitration clause or to have Ascend as a party to the Agreements must be considered purposeful, see Hogan, 914 F.3d at 40.  The Agreements' integration clauses, [ECF No. 8-2 at 4 (December 2017 Agreement); id. at 16 June 2018 Agreement)], reinforce the fact that the parties' intent was to limit the right to arbitration to claims "arising from" the Agreements, see Hogan, 914 F.3d at 40.

Thus, Defendants' claims against Ascend in the Arbitration do not "arise from" the Agreements. This alone precludes Defendants from compelling Ascend to arbitrate these claims, but the Court will, in the interests of completeness, briefly address each of Defendants' arguments as to why nonsignatory Ascend should be required to arbitrate.

### B.    Equitable Estoppel Does Not Apply

"Equitable estoppel 'precludes a party from enjoying rights and benefits under a contract while at the same time avoiding its burdens and obligations.'" <u>Ouadani</u>, 876 F.3d at 38 (quoting <u>InterGen</u>, 344 F.3d at 145). "Federal courts generally 'have been willing to estop a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" <u>Id.</u> (quoting <u>InterGen</u>, 344 F.3d at 145). "But courts have been reluctant to estop a nonsignatory attempting to avoid arbitration." <u>Id.</u> (citing <u>InterGen</u>, 344 F.3d at 145–46). "In the latter scenario, 'estoppel has been limited to cases [that] involve non-signatories who, during the life of the contract, have embraced the contract despite their nonsignatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract.'" <u>Id.</u> (alteration in original) (quoting <u>InterGen</u>, 344 F.3d at 146). Defendants argue that Ascend embraced the Agreements by performing obligations, such as paying Carcharadon certain sums due under the Agreements and conducting pilot testing for the WeWork project, and reaping benefits, such as the appreciation of its equity interest in Aryze, [ECF No. 8 at 16–18]. Ascend responds that any benefit that Ascend received from the Agreements was an indirect benefit, which is insufficient to compel arbitration. [ECF No. 12 at 13–14].

Defendants' equitable estoppel theory is unavailing. As an initial matter, Defendants have pointed to no case with similar facts where a court compelled a nonsignatory to arbitrate on the basis of equitable estoppel. In <u>InterGen</u>, 344 F.3d at 145–46, <u>E.I. DuPont de Nemours and</u>

Co. v. Rhone Poulenc Fiber and Resin Intermediates, S.A.S., 269 F.3d 187, 202 (3d Cir. 2001),

and Zurich American Insurance Co. v. Watts Industries, Inc., 417 F.3d 682, 688 (7th Cir. 2005),

all cited by Defendants, [ECF No. 8 at 15–18], the courts found that equitable estoppel did not

apply.  In American Bureau of Shipping v. Tencara Shipyard S.A., also cited by Defendants,

[ECF No. 8 at 16], the Second Circuit held that a yacht's ownership group benefitted directly

from a certificate of classification, to which it was non-party, and was therefore estopped from

avoiding arbitration pursuant to the certificate's arbitration clause.  170 F.3d 349, 353 (2d Cir.

1999).  In that case, the court emphasized the fact that, without the certificate, the ownership

group would not have been able to register the vessel with the French government.  Id.  Here, in

contrast, the Agreements bestow no tangible, concrete benefit upon Ascend because they concern

services that Carcharadon provided to Aryze, not Ascend.  Where there is no evidence that

Ascend "consistently maintained that other provisions of the [Agreements] should be enforced to

benefit [it]," InterGen, 344 F.3d at 145 (quoting Int'l Paper Co. v. Schwabedissen Maschinen &

Anlagen GMBH, 206 F.3d 411, 418 (4th Cir. 2000)), or otherwise "enjoy[ed] rights and benefits

under" the Agreements, id., the Court cannot find that Ascend is estopped from avoiding

arbitration.

Further, as a factual matter, Defendants' purported evidence that Ascend embraced the

Agreements is unpersuasive.  First, the fact that Ascend made certain payments to Carcharadon

pursuant to the Agreements does not demonstrate that Ascend embraced the Agreements.  As

Defendants acknowledge, Aryze was a newly-formed entity, without its own bank account and

no source of revenue, [ECF No. 8 at 10], and it is therefore unsurprising that it did not have cash

on hand to pay Carcharadon.  Ascend did not bind itself to arbitrate merely by electing to pay

Carcharadon directly as opposed to providing the cash to Aryze to pass along to Carcharadon.

Additionally, nothing in the Agreements obligates Ascend to make those payments or imposes any other contractual duties upon Ascend.[14]

Second, with respect to the WeWork testing, Defendants concede that Ascend and Carcharadon executed a separate agreement under which Carcharadon provided services to Ascend in connection with the test.  [ECF No. 8 at 10].  This demonstrates that Ascend's testing was not done pursuant to the Agreements and, further, that Sweig was aware of the distinction between Ascend and Aryze and of the need to contract with one or the other depending on the circumstances.

Third, the fact that Ascend may have benefitted indirectly from the Agreements is insufficient to support the application of equitable estoppel.  See InterGen, 344 F.3d at 146. Here, Ascend benefitted only to the extent that its ownership interest in Aryze may have appreciated because of services that Carcharadon provided to Aryze.  This is an indirect benefit.

Thus, Defendants' equitable estoppel argument fails.

## C.       Ascend Is Not a Third Party Beneficiary to the Agreements

"It is well settled that third-party beneficiary status does not allow the holder to avoid the effect of otherwise enforceable contract provisions."  InterGen, 344 F.3d at 146.  "It follows, then, that a third-party beneficiary of a contract containing an arbitration clause can be subject to that clause and compelled to arbitrate on the demand of a signatory."  Id.  The threshold question is whether Ascend is a third-party beneficiary of the Agreements.  See id.  The Court "must approach this threshold with care since the law requires 'special clarity' to support a finding 'that the contracting parties intended to confer a benefit' on a third party."  Id. (quoting McCarthy v. Azure, 22 F.3d 351, 362 (1st Cir. 1994)).  In undertaking this analysis, the Court bears in mind

---

[14] Ascend is not, for instance, a guarantor.

that "courts ought not to distort the clear intention of contracting parties or reach conclusions at odds with the unambiguous language of a contract." Id. (citing EEOC v. Waffle House, Inc., 534 U.S. 279, 294 (2002)).  Defendants argue that the overall purpose of the Agreements was to commercialize Ascend's assets and therefore Ascend is the ultimate beneficiary of the Agreements.  [ECF No. 8 at 20].  Ascend responds that the Agreements were designed to govern the business relationship between Aryze and Carcharadon, and that even if Ascend was a third party who benefitted from the Agreements, it was not a third-party beneficiary.  [ECF No. 12 at 15–16].

The Court finds that Ascend is a not a third-party beneficiary of the Agreements.  First, the inclusion of the phrase "between the parties" in the arbitration clause, coupled with the undisputed fact that Ascend is not a party to the Agreements,[15] is clear evidence that the Agreements do not confer arbitration rights or duties on Ascend (or on any other third party). Hogan, 914 F.3d at 40.  The Court declines to read into the Agreements rights and obligations that the parties did not include, especially in light of the integration clause that each agreement contains.  See InterGen, 344 F.3d at 146–47; Hogan, 914 F.3d at 40.

Second, notwithstanding Defendants' characterization, by their express terms, each agreement's purpose was to govern Carcharadon's provision of specified services to Aryze. [ECF No. 8-2 at 2 (December 2017 Agreement); id. at 14 (June 2018 Agreement)].  The fact that it was contemplated that Ascend would provide some or all of the underlying technology does not automatically render Ascend a third-party beneficiary.  Defendants seemingly argue that a parent company is a third-party beneficiary of any agreement entered into by its subsidiary because, inevitably, the parent will derive some benefit from that agreement.  But "an intimate

---

[15] In fact, the Agreements do not reference Ascend by name at all.

corporate relationship, without more, is not tantamount to an assignment of specific rights" and

"[t]here is an important distinction between a nonsignatory who may benefit from a signatory's

exercise of its contractual rights (because of, say, an equity stake) and a third-party beneficiary."

InterGen, 344 F.3d at 147.  Although Ascend may have "stood to gain" from Aryze's

"commercial successes," where the Agreements do not "mention nor manifest an intent to confer

specific legal rights upon" Ascend, Defendants may not "require [Ascend] to fulfill any

corresponding legal duties (such as the duty to arbitrate)."  Id.; see Hogan, 914 F.3d at 40–41

(rejecting third-party beneficiary theory where arbitration clause applied only to disputes

"between the Parties" and there was no other contractual language manifesting intent to confer

arbitration rights on any third party).

> Accordingly, Defendants' third-party beneficiary theory fails.

> **D.     Defendants' Agency Theory Fails**

> Lastly, Defendants argue that Ascend was acting as an agent of Askey and/or Aryze

when it performed certain obligations (e.g., paying Carcharadon) under the Agreements and is

therefore bound by the arbitration clauses contained therein.[16]  [ECF No. 8 at 18–19].

Defendants' agency argument also fails.  First, as discussed above, the Agreements' arbitration

provisions refer only to disputes "between the parties," which suggests that the parties did not

intend agents, or any other non-parties, to be bound.  Contracting parties often include language

in arbitration clauses indicating an intent to bind non-parties.  See, e.g., Barbosa v. Midland

Credit Mgmt., Inc., 981 F.3d 82, 89 (1st Cir. 2020) (discussing arbitration provision which

---

[16] Defendants also assert that when Ascend performed testing for WeWork, it was acting as
Aryze's agent.  [ECF No. 8 at 19].  Even assuming that is true, it is of no consequence because,
as Defendants concede, [id. at 10], Ascend entered into a wholly separate agreement with
Carcharadon in connection with that testing and Defendants do not argue that that agreement had
a relevant arbitration clause.

bound the contracting party as well as its "employees, parents, subsidiaries, affiliates, beneficiaries, agents and assigns"); Christensen v. Barclays Bank Del., No. 18-cv-12280, 2019 WL 1921710, at *2 (D. Mass. Apr. 30, 2019) (discussing arbitration clause with similar language).  The decision to forgo such language must be considered purposeful.  See Hogan, 914 F.3d at 40.

Second, the cases upon which Defendants rely presented different factual scenarios.  In InterGen, the First Circuit considered whether a nonsignatory principal would be bound to arbitrate because of an arbitration agreement entered into by its agent.  344 F.3d at 147–48.  In Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc., the Third Circuit held that nonsignatory defendants could compel the plaintiffs to arbitrate pursuant to the arbitration agreement between the plaintiffs and the defendants' signatory principal.  7 F.3d 1110, 1121–22 (3d Cir. 1993).  Here, Defendants are seeking to force Ascend, a nonsignatory, to arbitrate based on its purported agency relationship with Askey and/or Aryze.  In the Court's view, given the foundational maxim that "arbitration is a matter of consent, not coercion," Ouadani, 876 F.3d at 36 (quoting Stolt-Nielsen S.A., 559 U.S. at 681)), there is a meaningful difference between invoking an arbitration clause defensively against a signatory (as the defendants in Pritzker did) and doing so offensively against a nonsignatory (as Defendants seek to do here).

In sum, given the express language of the Agreements—which makes no reference to Ascend in the arbitration provisions or elsewhere—and Defendants' failure to cite any cases directly on point, the Court cannot conclude that Defendants have met their burden of proving that Ascend is bound to arbitrate based solely on the fact that Ascend paid for some portion of

Carcharadon's services.[17]  See Oyola, 295 F. Supp. 3d at 16–17 (noting that the burden is on the

proponent of arbitration).  Thus, Defendants' agency theory fails.

### E.    The Interests of Judicial Economy Cannot, Alone, Justify Compelling Arbitration

Defendants also argue that, given the common issues of fact and law, litigating their

claims against Ascend in one forum and arbitrating their claims against Askey and Aryze in

another will be inefficient and could lead to inconsistent results.  [ECF No. 17 at 10–11].  In

response, Ascend argues that regardless of any resulting inefficiencies, it cannot be compelled to

arbitrate when it did not agree to do so.  [ECF No. 20 at 5].  Although Defendants may have to

"resolve these related disputes in different forums[, t]hat misfortunate . . . occurs because the

relevant federal law *requires* piecemeal resolution when necessary to give effect to an arbitration

agreement."  Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1, 20 (1983);

see LG Elecs., Inc. v. Wi-Lan USA, Inc., 623 F. App'x 568, 571 (2d Cir. 2015).  Accordingly,

the Court will not force Ascend to arbitrate when it is not required to do so merely because it

would be more efficient for Defendants to adjudicate their claims in a single forum.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' motion to compel arbitration, [ECF No. 7],

is DENIED.

### SO ORDERED.

February 5, 2021                                          /s/ Allison D. Burroughs
                                                         ALLISON D. BURROUGHS
                                                         U.S. DISTRICT JUDGE

---

[17] The Court also notes that Defendants' claims against Ascend do not relate to its conduct as a purported agent (i.e., paying Carcharadon).  See Grand Wireless, 748 F.3d at 11 (noting that general rule that "an agent is entitled to the protection of her principal's arbitration clause *when the claims against her are based on her conduct as an agent*" (emphasis added)).